NOT FOR PUBLICATION                                    (Doc. Nos. 13, 14)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                              :
T.R. and D.R. o/b/o J.R.,                     :
                                              :
                    Plaintiffs,               :
                                              :
            v.                                :
                                              :
CHERRY HILL TOWNSHIP BOARD                    :
OF EDUCATION,                                 :
                                              :
                    Defendant.                :
_____      :    Civil No. 11-2547 (RBK/KMW)
                                              :
CHERRY HILL TOWNSHIP BOARD                    :    **OPINION**
OF EDUCATION,                                 :
                                              :
                    Plaintiff,                :
                                              :
            v.                                :
                                              :
T.R. and D.R. o/b/o J.R.,                     :
                                              :
                    Defendants.               :
_____      :

**KUGLER**, United States District Judge:

        This matter comes before the Court after judgment for petitioners in an administrative

proceeding pursuant to a suit under the Individuals with Disabilities in Education Act ("IDEA").

Here, T.R. and D.R. move, on behalf of J.R, for judgment on a stipulated record against Cherry

Hill Township Board of Education.  T.R. and D.R. seek enforcement of the administrative order

to place J.R. in a residential facility, as well as costs and attorneys' fees.  Cherry Hill Township

Board of Education ("the Board") has also filed a motion for summary judgment against T.R.

and D.R., claiming that the administrative determination below must be reversed because the

Board did not violate the IDEA in denying J.R. residential education placement, and because the

Administrative Law Judge ("ALJ") improperly failed to recuse himself from the proceedings

below.  Because the Court finds that J.R. requires residential placement in order to receive the

free appropriate public education guaranteed by the IDEA, T.R. and D.R.'s motion is granted,

and the motion of Cherry Hill Township Board of Education is denied.

## I.      BACKGROUND

### A. Procedural History

This matter is the consolidation of two actions arising from an administrative decision in

a case under the Individuals with Disabilities Education Act of 2004 ("IDEA"), 20 U.S.C. § 1400

et seq.  Seeking residential placement for J.R., their autistic adoptive son, T.R. and D.R. filed a

petition for a due process hearing against the Cherry Hill Township Board of Education on July

15, 2009.  Initial Decision of ALJ Dennis P. Blake, April 8, 2011 ("ALJ Op."), 2.  On August 21,

2009, an unsuccessful mediation took place.  Id.  The first hearing in the underlying

administrative action took place before ALJ Dennis P. Blake on January 26, 2010, and additional

hearings were conducted on eleven subsequent noncontinuous days, with the record closing on

March 11, 2011[1], when the parties filed their final summations.  Id.  In a decision dated April 8,

2011, the ALJ granted the due process petition of T.R. and D.R., which sought residential

placement for their autistic son, J.R.  The ALJ denied T.R. and D.R.'s request for Compensatory

Education payments beginning with the 2007-08 school year.  T.R. and D.R. subsequently

brought an action in this Court for attorneys' fees and costs, as the prevailing party in the

administrative proceeding.  Compl., 11-cv-2547.  The Cherry Hill Township Board of Education

also filed an action in this Court, appealing the ALJ's decision.  Compl., 11-cv-3875.  On

---

[1] The text of the ALJ's Opinion indicates that the record closed on March 11, 2011; however, the first page of the ALJ's Opinion indicates that the record closed on March 4, 2011.  Compare ALJ Op., 2 with ALJ Op., 1.

November 2, 2011, Magistrate Judge Karen M. Williams issued an Order consolidating the two matters under one docket (11-cv-2547). Now before the Court is T.R. and D.R.'s motion for judgment on a stipulated record, affirming the decision of ALJ Blake below and granting costs and counsel fees to T.R. and D.R. Also before the Court is the Board's motion for summary judgment in its action to reverse the ALJ's decision on the grounds that the Board's nonresidential placement of J.R. was not in violation of the IDEA, and because the ALJ's alleged bias and conflict of interest should have led him to recuse himself from the administrative proceedings.

### B. Facts

Born on June 3, 1998, J.R. was 12 years old at the time of the ALJ's decision below. ALJ Op., 3. J.R. is classified as autistic and eligible for special education. Id. J.R. was diagnosed with a Pervasive Development disorder when he was two years old, and he has since been diagnosed with autism and seizure disorder. Cherry Hill Township Board of Education Statement of Material Facts ("Township Board SMF"), ¶¶ 2-3. Pursuant to the IDEA, the Cherry Hill Township Board of Education is obligated to provide J.R. with a free appropriate public education ("FAPE"). Id., see also 20 U.S.C. § 1412(a)(1)(A).

During the 2007-08 and 2008-09 school years, J.R. attended the Bret Harte Elementary School Autism Support Class ("Bret Harte"), which is "a special class for students with autism that has no more than six students and is run by a special education teacher who has educational assistants staffed in the room and related services provided in accordance with each individual student's needs." ALJ Op., 3. During the 2009-10 school year, and continuing through the ALJ's decision, J.R. attended the day program at the Bancroft School Elementary Program ("Bancroft") in Haddonfield, New Jersey. Id. At the heart of this dispute is whether J.R.'s

placement at the Bancroft day program is sufficient to constitute a free appropriate public education ("FAPE"), or whether, as T.R. and D.R. argue and as the ALJ found, J.R. requires a residential placement in order to satisfy his right to FAPE.

### C. Summary of Administrative Proceedings

In the administrative proceedings below, progress reports from J.R.'s tenure at both Bret Harte and Bancroft were examined, as were other occupational therapy, psychological, and speech and language reevaluations, and the Individualized Education Programs ("IEPs") that have been assigned to J.R. during the relevant years.  J.R.'s May 16, 2007 IEP was written while J.R. was at Bret Harte, and recommended that J.R. return there the following year.  The IEP indicated that J.R. "is a very sweet child" who was "improving in his ability to follow classroom routines," and showed some "very strong" abilities, though his "performance on academic tasks" was deemed "inconsistent."  5/16/07 IEP, Cherry Hill Township Bd. of Educ. Summ. J., Ex. I, 2. However, J.R. manifested an "inability to regulate himself" and, moreover, "his self-stimulatory behaviors (flapping arms, spinning and mouthing objects) frequently inhibit[ed] him from participating in educational tasks," and J.R. also showed "episodes of aggressive and noncompliant behavior."  Id.  The 5/16/07 IEP further explains that J.R. "has a lot of academic skills but has difficulty demonstrating his knowledge independently and continues to work toward generalizing skills . . . ."  Id.  This emphasis on generalization—essentially, "putting . . . in practice" without adult prompting the skills J.R. learns—is considered to be an important part of J.R.'s development.  Tr., Apr. 16, 2010 Hearing, 71 (defining generalization and establishing, through cross-examination of a Board witness, that it is unclear that J.R. has generalized the skills he practices at school).  Moreover, the 5/16/07 IEP indicates that J.R.'s "independence that was noted at school is not seen at home," and that "[h]e tends to regress in

4

one area when he progresses in other areas." 5/16/07 IEP, at 2. Likewise, the "Speech/Language Therapy" component of the Present Levels of Educational Performance ("PLEP") report included in J.R.'s 5/16/07 IEP reiterated that J.R. "is much more communicative when in a structured environment that supports his behavioral needs." Id., PLEP. Finally, the Placement Decision of the 5/16/07 IEP indicated a "3rd grade self contained autistic support classroom with opportunities for mainstreaming." Id. ("Decision-Making for Removal from General Education Classes").

J.R.'s May 23, 2008 IEP also showed that J.R. was currently placed at Bret Harte, and that his planned placement for the following year was also at Bret Harte, in grade 4 of the Autistic Support program. As explained in the 5/16/07 IEP, J.R.'s 5/23/08 IEP shows that, despite the fact that J.R. is "very sweet and affectionate," and can talk in 5-6 word sentences "[d]uring structured classroom activities," nevertheless, "in less-structured classroom activities, when [J.R.] wants something . . . he will simply try to grab the item he wants instead of using words to ask for it (although he is capable of doing so)." 5/23/08 IEP, Cherry Hill Township Bd. of Educ. Summ. J., Ex. L, 2. Moreover, as with the previous year's IEP, the 5/23/08 report indicated that J.R. "struggles with generalizing skills . . . to group and any other alternate settings." Id. Moreover, J.R.'s "self-stimulatory behaviors seriously impact his ability to be independent . . . ." Id. The 5/23/08 IEP lists under "Parental Concerns" the desire for J.R. "to be independent in his daily living skills, especially with his toileting," and the hope that J.R. will learn to "use appropriate language to express his wants and needs." Id. at 3.

J.R.'s May 27, 2009 IEP, also written while J.R. was at Bret Harte, and projecting his placement there the following year, reflects many of the same issues—in fact, it expresses verbatim much of what is contained in the 5/23/08 IEP. See 5/27/09 IEP, Cherry Hill Township

Bd. of Educ. Summ. J., Ex. N, 3.  However, the 5/27/09 IEP also reflects some decline in J.R.'s progress; specifically, it indicates that J.R. "has had a dramatic increase in innapropriate [sic] behavior starting December 2008 through present," which includes "aggressions such as hitting, kicking, and banging . . . ; shrieking and screaming 100+ times during the school day; using inappropriate language . . . ; and noncompliance such as throwing instructional materials."  Id. The 5/27/09 IEP explained that "[d]ue to [this] increase in inappropriate behavior his academic and classroom performance has been inconsistent and difficult to assess."  Id.  Moreover, J.R.'s parents said their "[g]reatest concern is behavior," because J.R. "requires constant attention in the home," and "is hitting without provocation."  Id.  J.R.'s parents "cannot leave him with his sister without supervision."  Id.  Tellingly, J.R. "has not generalized any school performance at home."  Id.

J.R. received another IEP on July 23, 2009, which reflected that he would be placed at Bancroft for the 2009-10 school year.  7/23/09 IEP, Cherry Hill Township Bd. of Educ. Summ. J., Ex. O.  Once at Bancroft, J.R.'s IEP for the period ending on March 29, 2010 recorded improvement in visual and performing arts, and the "wellness" component of health and physical education.  3/29/10 IEP, Cherry Hill Township Bd. of Educ. Summ. J., Ex. S.  Although the reports (which assess J.R.'s performance in much more discretely defined areas than those described in the Bret Harte IEPs) do indicate some progress, they also generally reflect that J.R. must learn to do more "with decreased prompting."  Id.  Moreover, because the Bancroft IEPs cover in detail many individual tasks, but do not appear to provide an overview of J.R.'s progress across categories, it is difficult to compare his performance at Bancroft with his performance at Bret Harte in the previous years.  The Bancroft IEPs do not appear to record that J.R. engaged in

aggressive behaviors of the kind cataloged at Bret Harte; however, it is unclear whether or not

these reports would record such generalized patterns of behavior.

At the hearings before the ALJ, however, both parties offered extensive testimony, which

the ALJ comprehensively details in his Opinion below, and which provides a basis for

comparing J.R.'s behavioral progress at Bret Harte and Bancroft.  At the hearings before the

ALJ, the Board offered testimony from the following individuals:

- <u>John Moody</u>, Cherry Hill School District supervisor of special education (Jan. 26, 2010)
- <u>Daniel J. Del Vecchio</u>, School psychologist for Cherry Hill Public Schools (Mar. 1, 2010)
- <u>Michele Smith</u>, Special education teacher at Bret Harte (Apr. 16 and 28, 2010)
- <u>Lisa Oxenberg</u>, Special education teacher at Bancroft, formerly Applied Behavior Analysis ("ABA") therapist for Lovaas Institute for Children with Autism in Cherry Hill (Apr. 28, 2010)
- <u>Nicole Tomaselli</u>, School psychologist at Bancroft (Apr. 28 and June 14, 2010)
- <u>Sharon Jurman</u>, Senior Director of Early Childhood and Outreach Services at Bancroft (rebuttal testimony Oct. 28, 2010)

Mr. Moody, who has a Bachelor's Degree in Psychology as well as a Master's Degree in

School psychology and a school psychologist certificate, was admitted "to testify as an expert in

the field of development, implementation, and evaluation of special education programs."  ALJ

Op., 24.  Mr. Moody first became familiar with J.R. in spring 2007, when he participated in an

IEP conference with T.R. and D.R.  <u>Id.</u>  Mr. Moody testified that the services J.R. received at

Bret Harte during the 2007-08 year offered a high level of structure and routine, which was

appropriate for J.R.  Cherry Hill Township Bd. of Educ., Statement of Material Facts ("Bd.

SMF"), ¶ 9.  The same was true of J.R.'s placement and services in 2008-09, and Mr. Moody

testified that these were appropriate for J.R.  <u>Id.</u> at ¶ 13.  Ms. Smith, J.R.'s special education

teacher at Bret Harte, testified to an improvement both in J.R.'s skills over the 2007-08 school

year, and over the 2008-09 school year as well.  <u>Id.</u> at ¶ 10.  Specifically, J.R.'s ability to

complete "seat work," his math skills, and his vocabulary all increased over those two school

years.  Id. at ¶¶ 10-12.  Mr. Del Vecchio became J.R.'s case manager in October 2008, and he testified that, during his school days at Bret Harte, J.R. was around general education students less than 40 percent of the time.  Id. at ¶ 13.

For the 2009-10 school year, J.R. was placed as a fifth-grader in a "Multiply Handicapped" classroom at Bancroft, a private school in Haddonfield.  Id. at ¶ 14.  J.R was transferred from Bret Harte to Bancroft because of increased "specialized training and experience in special education, particularly with respect to autism," at the latter institution.  Id. at ¶ 16 (internal quotation marks omitted).  Mr. Del Vecchio testified that placement at Bancroft allowed J.R. to "concentrate on functional skills, daily living skills, and pre-vocational training." Id. at ¶ 16 (internal punctuation and quotation marks omitted).  He and Ms. Smith both testified that J.R.'s parents "were primarily concerned with further developing J.R.'s daily living skills— outside of the school environment."  Id. (internal quotation marks omitted).  Ms. Smith also testified that J.R.'s behavior began to change dramatically—for the worse—toward the end of the 2008-09 school year, motivating the decision to change J.R.'s placement from Bret Harte to Bancroft.  Id. at ¶ 17; see also Tr., Apr. 16, 2010 Hearing, 56-57.

Ms. Oxenberg, J.R.'s special education teacher at Bancroft from 2009-10, testified that J.R. mastered nine skill areas under her instruction, and that J.R. had an individual aide in the classroom for that school year.  Bd. SMF, ¶ 19  Ms. Jurman, Bancroft's Director of Early Childhood and Outreach Services, testified that J.R.'s parents initially elected to receive only six of the ten hours of in-home services offered by the Board.  Id. at 20.  Mr. Moody testified that, after several months at Bancroft, J.R. demonstrated a decrease in his aggressive behaviors. Moreover, Ms. Tomaselli, Bancroft school psychologist, testified that, although "[t]he intensity for J.R.'s behaviors are low," "there are days where he does have a high rate of behaviors."  Tr.,

4/28/10 Hearing, 146.  Ms. Tomaselli explained that, despite the fact that J.R.'s rate of behaviors "varies," J.R. is "overall . . . on the low end" because "[h]is problem behaviors are managed by the classroom management plan," as opposed to necessitating an individualized behavior plan. Id. at 146-47.  Ms. Tomaselli further testified that J.R.'s aggressive behaviors seemed to have gone down, and the ALJ found that, since his placement at Bancroft, "[h]e's improved."  Id. at 183, 187.  Mr. Moody, Mr. Del Vecchio, and Ms. Oxenberg all testified that J.R.'s day placement at Bancroft is "appropriate" for J.R.  Bd. SMF, ¶ 31.

T.R. and D.R. also offered witness testimony at the hearings, from the following individuals:

- Daniel LeGoff, Assistant Director of Y.A.L.E. (private special-needs school) (June 10 and 14, 2010)
- Francis Perrin, Clinical Director of Campus and The Lindens Residential Programs at Bancroft (June 16, 2010)
- Denise Kerth, Behavior analyst in Consultation and Training Department at Bancroft (June 16, 2010)
- Dr. David Holmes, Founder of Life Span Services (autism services consulting company), doctorate in educational psychology (July 8, 2010)
- D.R., J.R.'s mother (Aug. 25, 2010, rebuttal testimony Jan. 18, 2011)

In 2009, J.R. received a Neurodevelopmental Assessment from Dr. LeGoff at the Center for Neurological and Neurodevelopmental Health ("CNNH").  T.R. and D.R. Br., 8.  Although Dr. LeGoff was originally retained by the District Child Study Team to conduct an assessment, he testified on behalf of T.R. and D.R. at the hearings below.  Id. at 9.  Dr. LeGoff testified that J.R. is "the most autistic child he had ever seen" because of "J.R.'s very high frequency of nonfunctional repetitive behaviors, . . . which inhibits his ability to learn," as well as J.R.'s inability to imitate, and J.R.'s "very diminished level of social responsiveness."  Id.  Dr. LeGoff also noted J.R.'s low levels of self-care and communication skills.  Id. at 10.  Accordingly, he recommended, in his May 29, 2009 report and in the hearing below, that residential placement be

considered for J.R.  Id.  Dr. LeGoff testified that J.R.'s moderate mental retardation indicates that he "can have [a] relatively functional li[fe]," if he receives the more intensive level of instruction a residential placement would afford.  Tr., June 14, 2010 Hearing, 127.  Dr. LeGoff explained that J.R.'s "independent functioning won't come along if we don't address the repetitive behaviors and aggression because they're interfering with his learning."  Id.  Moreover, based on J.R.'s most recent IEP, Dr. LeGoff concluded that day placement at Bancroft with ten hours weekly of the extended program in the home would not constitute FAPE for J.R.  Id. at 128-29.

Dr. Perrin, Clinical Director of Lindens and Haddonfield Residential Services at Bancroft, explained that the typical residential student exhibits "challenges in either school or their home setting," which the residential Individualized Habilitation Plan would help to address. Tr., June 16, 2010 Hearing, 67, 71 (emphasis added).  Dr. Perrin explained that "parents have competing contingencies in a home environment especially if there are siblings"—a contingency that does exist in J.R.'s case.  Id. at 72.  Accordingly, Dr. Perrin recommended residential placement for J.R.  Ms. Kerth, a behaviorist at Bancroft who has worked with J.R. at home and school, testified that, contrary to Ms. Tomaselli's testimony, J.R.'s behaviors had not subsided at school.  Id. at 19.  Ms. Kerth considered the full support of one-on-one aides to be necessary for the management of J.R.'s behavior, and accordingly recommended a residential placement for J.R.  Id. at 20.

After the Board recommended day placement at Bancroft, T.R. and D.R. consulted with Dr. Holmes to evaluate J.R.'s education program at Bret Harte, and his home program.  Id. at 12. After assessing J.R. at home and at school, as well as reading his school and clinical records, Dr. Holmes issued a report on June 25, 2009, which recommended residential placement.  Id. at 12. Aware that the District had proposed transferring J.R. to Bancroft's day program, Dr. Holmes,

who has been a consultant to Bancroft in addition to serving on its advisory board, nevertheless reported that the day program was not appropriate for J.R.  Id.  On March 17, 2010, Dr. Holmes issued a follow-up report on J.R., which included an assessment of J.R. at Bancroft as well as the result of interviews with J.R.'s family.  Dr. Holmes described what he observed of J.R.'s attention at Bancroft as "really more of a containment situation than a teaching situation."  Id. at 21.  Furthermore, Dr. Holmes's interview of T.R. and D.R suggested that J.R.'s behaviors were becoming more intense at home, which was particularly exacerbated by the fact that he has grown bigger and is more capable of causing damage.  Id. at 22.  For example, on two occasions, J.R. is reported to have broken the headboard of his bed by banging his head back and forth.  Id.  He has also broken his dresser and thrown his TV off of its stand.  Id.  Dr. Holmes therefore reiterated his initial assessment that J.R. can only receive an appropriate education through residential placement.  Id.

Finally, D.R., J.R.'s mother, testified that J.R. had gotten more aggressive at home, at that his behaviors included an increase in aggressive behaviors (hitting, hair-pulling) of his sister.  ALJ Op., 85.  Reinforcing Dr. Perrin's analysis that "competing contingencies" such as siblings render it difficult for parents to afford some disabled children with the structure they need, D.R. explained that she cannot give J.R. all of her attention.  Id.  D.R. also indicated that she cannot take J.R. out of the house without an aide, particularly because of J.R.'s masturbating.  Id. at 86.  Moreover, D.R. indicated that J.R.'s toileting skills had not improved from the summer of 2009.  Id.  She testified that J.R. frequently urinates on the floor, and that just cleaning up the floor after him constitutes a large part of her day.  Id.  Though J.R. does not wear a diaper at school, he does wear one at home.  Id.  D.R. also reported that she had observed her son at Bancroft in spring 2010, and that J.R. was heavily supervised and prompted by his aide.  Id.

II.      STANDARD

A. The IDEA and FAPE Requirements

The IDEA obliges states in receipt of federal funding under the statute to guarantee a

FAPE to all children with disabilities. 20 U.S.C. § 1412(a)(1)(A).  The IDEA instructs states to

develop a detailed instructional plan—an IEP—for every disabled child. 20 U.S.C. § 1412(a)(4).

The IEP is specially designed for each child, consisting of "a specific statement of a student's

present abilities, goals for improvement of the student's abilities, services designed to meet those

goals, and a timetable for reaching the goals by way of the services."  Holmes v. Millcreek Twp.

Sch. Dist., 205 F.3d 583, 589-90 (3d Cir. 2000) (citing 20 U.S.C. § 1401(a)(20)).

In defining the contours of FAPE, the Supreme Court explained that the disabled child is

entitled to "such services as are necessary to permit the child 'to benefit' from the instruction."

Bd. of Educ. v. Rowley, 458 U.S. 176, 188-189, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).  The

IEP must provide a "'basic floor of opportunity,' but not necessarily 'the optimal level of

services.'"  Holmes, 205 F.3d at 589-90 (quoting Carlisle Area Sch. v. Scott P., 62 F.3d 520,

533-34 (3d Cir. 1995)).  However, "although the state is not required to 'maximize the potential

of handicapped children,' . . . a satisfactory IEP must provide 'significant learning' and confer

'meaningful benefit.'"  T.R. v. Kingwood Twp. Bd. Of Educ., 205 F.3d 572, 577 (3d Cir. 2000)

(noting that the Third Circuit rejected as inadequate the "more than trivial or de minimis"

standard of Polk v. Central Susquehanna Interm. Unit 16, 853 F.2d 171, 180-85 (3d Cir. 1988)).

Further, the IDEA requires that students who fall under the provisions of the IDEA are to

be educated in the "least restrictive environment" ("LRE") 20 U.S.C. § 1412(a)(5)(A).  Where

possible, this requirement leads to "mainstreaming" disabled students by educating them

alongside nondisabled students.  Accordingly, the Third Circuit has "interpreted this mandate to

require that a disabled child be placed in the least restrictive environment . . . that will provide him with a meaningful educational benefit." T.R., 205 F.3d at 578. Defined further, "[t]he least restrictive environment is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995).

The burden of establishing the inadequacy of a proposed IEP rests on the challenging party, typically the parents of the disabled child. Schaffer v. Weast, 546 U.S. 49, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391 (3d Cir. 2006).

**B. Standard for Review of an ALJ's Decision**

In reviewing an administrative determination in an IDEA case, "the District Court applies a modified version of de novo review." Id. at 389 (citing S.H. v. State-Operated Sch. Dist., 336 F.3d 260, 269-70 (3d Cir. 2003)). While "the District Court must make its own findings by a preponderance of the evidence," the court "must also afford 'due weight' to the ALJ's determination." Shore Reg'l High School Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (citing 20 U.S.C. § 1415(i)(2)(B)(iii)). Thus, "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and where the ALJ has heard live testimony and made determinations of credibility, "that determination is due special weight." Shore Reg'l, 381 F.3d at 199 (citing S.H., 336 F.3d at 271). Furthermore, "[i]f a reviewing court fails to adhere to [the ALJ's findings], it is obliged to explain why." Shore Reg'l, 381 F.3d at 199.

III.    **DISCUSSION**

**A. Claim that the ALJ Was Biased in T.R. and D.R.'s favor**

At the outset, the Court considers the issue, raised by Cherry Hill Township Board of

Education, that the ALJ revealed bias or partiality relative to the case, and thus should have

recused himself.  The Third Circuit has explained that "[i]t is . . . axiomatic that 'trial before an

unbiased judge is essential to due process.'"  Hummel v. Heckler, 736 F.2d 91, 93 (3d Cir. Pa.

1984) (quoting Johnson v. Mississippi, 403 U.S. 212, 216 (1971) (internal quotation marks

omitted)).  Moreover, "[t]hat due process rule is applicable to administrative as well as judicial

adjudications." Id.  As an administrative law judge in the State of New Jersey, ALJ Blake is

subject to New Jersey Court Rule 1:12-1, which provides, in relevant part: "The judge of any

court shall be disqualified on the court's own motion and shall not sit in any matter, if the

judge . . has given an opinion upon a matter in question in the action; or . . . is interested in the

event of an action; or . . . where there is any other reason which might preclude a fair and

unbiased hearing and judgment, or which might reasonable lead counsel or the parties to believe

so . . . ."  N.J. Ct. R. 1:12-1(d)-(f).

However, as T.R. and D.R. argue, parties who discern that an ALJ's personal viewpoint

or conflicts of interest are negatively affecting them are expected to raise objections during the

administrative proceedings, so that they can be dealt with at that time.  T.R. and D.R. contend

that no objection was raised before the ALJ concerning the recusal issues that the Board

highlights here.  The Third Circuit has deemed it a "time-tested principle[] of administrative

law" that "'[s]imple fairness to those who are engaged in the tasks of administration, and to

litigants, requires as a general rule that courts should not topple over administrative decisions

unless the administrative body not only has erred but has erred against objection made at the time

14

appropriate under its practice.'" Keystone Roofing Co. v. Occupational Safety & Health Review Com., 539 F.2d 960, 964 (3d Cir. 1976) (citing United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952) (footnote omitted)).  The Third Circuit does not appear to have addressed the particular issue of whether an objection to the perceived bias or partiality of an ALJ must be first raised at the administrative proceedings below (in the absence of a statute establishing such a requirement[2]).[3]  Nevertheless, this Court finds that the fairness reasons for requiring such an objection to be raised at the administrative proceedings, as described in Keystone Roofing, apply equally here.

Furthermore, New Jersey Court Rule 1:12-2 indicates that "[a]ny party, on motion made to the judge before trial or argument and stating the reasons therefor, may seek that judge's disqualification."  N.J. Ct. R. 1:12-2.  In at least one instance, the District of New Jersey has emphasized this Rule in the context of IDEA suits, indicating that a "motion for recusal before the ALJ . . . is generally required under R. 1:12-2."  D.B. v. Ocean Twp. Bd. of Educ., 985 F. Supp. 457, 538 (D.N.J. 1997).[4]  However, this Court notes that Rule 1:12-2 is framed permissively, and in the absence of controlling law mandating that a motion for recusal of an

---

[2] The Third Circuit has found that, in the context of an action involving the Social Security Administration, recusal of an ALJ must be sought at a hearing below if it is to be raised later before a district court or the Third Circuit. See, e.g., Grant v. Shalala, 989 F.2d 1332 (3d Cir. 1993).  However, the Third Circuit based its reasoning upon the fact that the Social Security regulations specifically establish such a rule. Id. at 1346; see also 20 C.F.R. § 404.940 ("An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial . . . . if you object to the administrative law judge who will conduct the hearing, you must notify the administrative law judge at your earliest opportunity.").  The Court is unaware of any such provision governing the ALJ proceedings in the instant matter.

[3] Of course, in line with the Court of Appeals, New Jersey district courts have specifically held in the IDEA context that a party seeking relief in federal court must first exhaust the administrative process, because "failing to exhaust all administrative remedies would not only discredit the detailed procedures outlined in the statute but would also be contrary to Congress' intent that the needs of children are best met by having the parents and the local agency work together." D.A. v. Pleasantville Sch. Dist., 2009 U.S. Dist. LEXIS 30104 (D.N.J. Apr. 6, 2009) (citing Komninos v. Upper Saddle River Bd. of Educ., 13 F.3d 775, 778 (3d Cir. N.J. 1994)).  However, the requirement of exhaustion does not necessarily establish a requirement that each of a party's due process arguments must be individually raised as an objection at the administrative level.  Accordingly, this Court's decision on the Board's failure to raise the recusal issue at the administrative proceedings is not founded on the doctrine of administrative exhaustion.

[4] The First Circuit has found such an objection must be raised at the administrative proceedings.  See, e.g., Colin v. Schmidt, 715 F.2d 1, 5 (1st Cir. 1983) (deciding that, where a party had failed to object to an ALJ's alleged conflict of interest in administrative proceedings below, and did not offer an excuse for its failure to raise an objection in the administrative proceedings, the party was "foreclosed from challenging" the conflict).

ALJ must be made in administrative proceedings in order for the recusal issue to be raised on review, the Court will not adopt such a bright-line rule.

Similarly, in D.B., the court did not find that the lack of objection below disposed of the defendant Township Board's argument that the ALJ in that case was partial to the petitioner's. Rather, the D.B. Court "underst[oo]d the primary focus of the district's assertion of bias at this stage of review to be the validity of the result which the ALJ reached, and the manner in which he reached it. In other words, most of the arguments of the district which allege bias on the part of the ALJ also go to the merits of the appeal." Id. at 538-39. Accordingly, the district court "considered and addressed those arguments" in its review of the case, and "identified each of the conclusions of the ALJ which in [its] view were not consistent with the facts and the applicable law." Id. at 539.

Likewise, this Court will factor the allegations of the ALJ's bias into its review of the ALJ's decision. Because there is no law conclusively stating that the Board constructively waived (or did not waive) its right to object by failing to object to the ALJ's alleged bias below, nor is there clear precedent explaining that administrative proceedings must be reversed where an ALJ does not recuse himself under Rule 1:12-1, the Court declines to rule on either issue. Like the D.B. Court, this Court will consider the purported bias of the ALJ in the analysis of the correctness of the result reached below. First, the Court will recapitulate the recusal claims of the Cherry Hill Township Board of Education, and will discuss the persuasiveness of these claims. Keeping the purported claims of bias and prejudice in mind when assessing the amount of deference to afford the decision below, the Court will then move to substantive review of the ALJ's decision.

The Board points to the following three manifestations of bias and partiality: (1) statements by the ALJ that allegedly demonstrate his bias for T.R. and D.R.'s position; (2) the ALJ's personal ties to the parties in the case; and (3) the ALJ's expressions of negative regard for one of the Board's witnesses.  The Court addresses each of these in turn.

               1. <u>Claims of ALJ Bias Toward T.R. and D.R.</u>

The Board claims that the ALJ was biased in favor of the position of T.R. and D.R., and that the ALJ made several comments that indicate his bias or partiality.  For example, the Board argues that, at the June 14, 2010 hearing, the ALJ made the following comment that betrayed a bias toward the then-petitioners' position, namely the following: "Someone is going to have to just give me some law on this that's going . . . to somehow bring this together and show why the tragedy that this family has been exposed to is something that I can deal with because I can't imagine how I can."  Tr., June 14, 2010 Hearing, 138.  Likewise, the ALJ had also said, at a previous hearing, "I don't think there is any evidence before me as of yet showing that this child needs, and why he needs, a 24 hour environment for an educational benefit.  I think that's the standard.  I wish there were more I can do for this family, but that is my—I am limited to that function."  Tr., Apr. 14, 2010 Hearing, 27.  The Court does not find that these statements illuminate a bias on the ALJ's part.  Rather, these statements plainly indicate that, although the ALJ acknowledged that T.R. and D.R. faced an unfortunate situation, the ALJ recognized that he was "limited" to applying the legal standard before him.  While the ALJ's use of the word "tragedy" at the June 14, 2010 hearing certainly reflects empathy for the then-petitioners' position, this does not suggest that the ALJ was inclined to rule for T.R. and D.R. when the law would not support such a ruling—in fact, the ALJ expressly articulated the opposite sentiment.

More troubling is an exchange between the ALJ and counsel for the Board in the January 18, 2001 Hearing.  There, a rebuttal witness for the Board explained that J.R. had been receiving four to six hours of extended day services in the Bancroft day program.  Tr., Jan. 18, 2011 Hearing, 81.  The Board's witness recommended that J.R.'s receiving eight to ten hours of extended day services would "be more beneficial," and potentially be more sufficient to meet J.R.'s needs.  Id.  The ALJ indicated that the Board's witness was effectively advocating an increase of only two hours of time for J.R.: "And you said eight to ten [hours] was optimal, and thus, there's a two hour difference per week, and is that the difference between bringing a child into an area where he can make significant progress when we understand that this child masturbates without hesitation . . . and is not toilet trained, right?"  Id. at 84-85.  Thus the ALJ doubted that the "lynchpin" of the Board's argument—that the difference between four to six hours of instruction or eight to ten hours of instruction could "push[] someone over the edge" so that J.R. would be able to master the necessary skills.  Id. at 85.  Counsel for the Board objected, arguing that the ALJ's comment that the Board was suggesting only a two-hour difference was "a mischaracterization."  Id. at 86.  Rather, counsel argued, the relevant difference between the ranges was "[f]our to ten" hours, "not two."  Id.  The ALJ indicated that he was "entitled to" construe the difference between the two ranges in that manner, and counsel for the Board did not dispute that.

However, what the Board objects to is the following comment by the ALJ: "What have I told you all along?  I've said that this is a situation where this family should be aided to the extent that anybody can do it, all right?"  Id. at 87.  Counsel for the Board replied, "So are you on the record telling . . . me you're going to help the family?"  Id.  The ALJ answered, "Haven't I told you consistently that with respect to what this family has gone through with this child,

haven't I . . . ?"  Id.  Thus what the Board points to is an instance in which the ALJ purposefully construes a key fact—the amount of increase in extended day services that the Board's witness considered adequate for J.R. to benefit sufficiently from day placement—in favor of T.R. and D.R., out of desire to help the family.  This Court finds that, in this instance, the ALJ's determination was made as a result of his empathy for the family's situation—a fact that the ALJ did not dispute when counsel for the Board raised it.  Accordingly, although this Court "must also afford 'due weight' to the ALJ's determination," this Court will not defer to the ALJ's finding as to the difference between the amount of extended-day hours J.R. currently receives and the amount recommended by the Board's expert.  Shore Reg'l High School Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004).

## 2. ALJ's Personal Ties to Actors in ths Matter

The Board also argues that the ALJ should have recused himself because of certain personal affiliations that allegedly bear on this case.  Of the ALJ's putting these affiliations on the record, the Board comments that "the ALJ repeated his desire to be disqualified from the matter."  Township Board SMF, ¶ 34.  Indeed, the ALJ did state the following on the record: "I live in Haddonfield and my cousin, my favorite cousin is a Commissioner in Haddonfield . . . and he's right in the middle of this dispute."  Tr., Oct. 28, 2010 Hearing, 14.  Though counsel for the Board indicated that he would "take . . . under advisement" the ALJ's relationship to his cousin, the Board did not move for the ALJ to be disqualified.  Moreover, when the ALJ went on to say, "I contributed to his campaign as a matter of fact, in all seriousness," counsel for the Board replied only, "I believe you."  Id. at 15.

The ALJ also revealed that he "worked for about three or four years . . . in the '80s and '90s as a volunteer at Bancroft."  Tr., Jan. 18, 2011 Hearing, 136.  The ALJ went on to say, "[s]o

if anyone wants to preclude me for that, please."  Id. at 136-37.  Counsel for both parties

acknowledged that the ALJ had disclosed that experience previously.  Id. at 137.

The Court does not find that these comments amount to expression of the ALJ's "desire"

to be disqualified from the matter.  If the ALJ desired his own disqualification, he could have

recused himself pursuant to N.J. Ct. R. 1:12-1.  The Board does not suggest any reason to

account for why the ALJ, if so determined to be disqualified from the matter as the Board

suggests, would not simply recuse himself from the case.  Rather, it appears that the ALJ was

attempting to express—in as transparent a manner as possible—that he had relationships with an

individual and an institution related to the case in question.  Moreover, it appears that the ALJ

highlighted those relationships in such an explicit manner so that any party who wished to object

to the ALJ's involvement could freely do so.  The fact that no objections were raised, even upon

repeated opportunity by the ALJ, is telling.

The ALJ also remarked, "[t]hat's the other reason you ought to move to have me

disqualified because I live around the corner and I don't—I don't want [Bancroft] to—don't

want them to move away."  Tr., June 15, 2010 Hearing, 82.  However, despite the affinity for

Bancroft that the ALJ's statement betrays, the Court remains uncertain as to how such an affinity

would have biased the ALJ in this case—nor does the Board explain it.  The Board fails to

illuminate how it considers the ALJ's work at Bancroft some twenty to thirty years ago, or the

ALJ's affinity for Bancroft, to have prejudiced the ALJ against the Board in this case.

Particularly in light of the fact that different personnel from Bancroft testified for both parties in

the administrative proceedings, and the fact that Bancroft has both day and residential placement

(which means that J.R. could have remained at Bancroft regardless of which way the ALJ ruled),

it is unclear why the ALJ's previous experience with Bancroft should create an assumption of prejudice toward either party.

### 3. ALJ's Alleged Hostility to a Cherry Hill Township Board Witness

Finally, the Board claims, the ALJ was "openly hostile to the presence of the Board's representative, John Moody, at the administrative hearings in this matter." Township Board SMF, ¶ 33. To support the allegation of hostility, the Board cites several instances in the record wherein the ALJ negatively commented on Mr. Moody's presence at the hearing. For example, on June 14, 2010, when the Board's counsel entered Mr. Moody's appearance for the record, the ALJ commented that Mr. Moody had "nothing better to do than hang at the OAL every day [that the Board's attorney is] here. Right? . . . . As a Camden County tax payer, I'm just making inquiry." Tr., June 14, 2010 Hearing, 4. The ALJ made a similar comment at a later hearing: "Mr. Moody, once again you've got nothing better to do. You're here to supervise your attorney, right?" Tr., Jan. 18, 2011 Hearing, 4. Moreover, the ALJ remarked at one point in the June 14, 2010 proceeding, "Mr. Moody, maybe you can do something worth while today. Can you tell me what ABA is? No forget it, you're not—you're not talking." Tr., June 14, 2010 Hearing, 13-14.

Certainly, the tone used by the ALJ when referring to Mr. Moody's presence was less than polite, and his short-tempered questioning of Mr. Moody might, on first glance, appear to present a "reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so . . . ." N.J. Ct. R. 1:12-1 (f). However, despite his initially aggressive attitude toward Mr. Moody, the ALJ and Mr. Moody eventually had a productive dialogue on the meaning of ABA techniques. See, Tr., June 14, 2010 Hearing 18-30.

As the Court indicates in the above summary of the ALJ commentary highlighted by the Board, there is no doubt that, at several points throughout the proceedings, the ALJ could have employed more respectful language.  Where the ALJ's off-putting tone appears to have reflected bias—as in the ALJ's finding of a two-hour difference between the four to six and eight to ten hour ranges of extended care—the Court declines to give the ALJ's findings the usual deference.  However, the Court finds that the majority of examples cited by the Board, though they may reflect a contrariwise attitude or a sympathy for J.R.'s family, actually reinforce the ALJ's awareness that he is bound by the governing legal standards.  Moreover, this Court finds that the ALJ's purported conflicts did not require recusal, particularly in light of the Board's decision not to move for disqualification of the ALJ.

### B. Review of the Merits

As the ALJ noted in his Opinion, "the substantive inquiry for residential placement is whether the nature or severity of the handicap is such that education in regular or special classes, with the use of supplementary aids and services, cannot be achieved satisfactorily, under the Rowley standard of some meaningful educational benefit."[5]  D.B. v. Ocean Twp. Bd. of Educ., 985 F. Supp. 457, 492 (D.N.J. 1997).  In this case, the Board argues that, "[i]f left intact, the ALJ's ruling will disrupt J.R.'s progress in his current program and, contrary to the principles of the IDEA, will place him in an unnecessarily restrictive environment."  Cherry Hill Township Bd. of Educ. Summ. J. Br., 5.  The latter half of that argument is particularly salient in this case

---

[5] In Board of Education v. Rowley, the Supreme Court held that "a 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction.  Almost as a checklist for adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP.  Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate public education' as defined by the Act."  458 U.S. 176, 188-89 (1982).

because, even if it is found that J.R. would benefit from residential placement, it is nevertheless "a procedural requirement of IDEA that the school district give adequate consideration to the mainstreaming requirement in creating the individual education plan." D.B. v. Ocean Twp. Bd. of Educ., 985 F. Supp. 457, 489 at n.24 (D.N.J. 1997) (citing Oberti v. Board of Educ. of Clementon School Dist., 789 F. Supp. 1322, 1330 (D.N.J. 1992)).

In determining whether J.R.'s education meets the mainstreaming requirement of the IDEA, the ALJ correctly focused on the three factors identified in Oberti v. Clementon Borough Sch. Dist. Bd. of Educ.: "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom with supplementary aids and services; (2) a comparison of the educational benefits available in a regular class and the benefits provided in a special education class; and (3) the possible negative effects of inclusion on the other students in the class." 995 F.2d 1204, 1220 (3d Cir. 1995).

With regard to the first Oberti factor, the ALJ found that J.R.'s current placement in the Bancroft day program affords him "no exposure to any general education students during his school day, aside from any opportunity he might get to interact with people in his community during his community outings that occur every Friday." ALJ Op., 112. The ALJ also noted the testimony of Ms. Kerth, Dr. Holmes, and D.R., indicating that J.R. needs constant one-on-one support, in addition to Dr. Holmes's testimony that J.R. needs two-on-one support for some activities. Id. at 113. Moreover, D.R. testified to the difficulty of taking J.R. out of the home and his lack of involvement in the community. The ten hours of home support offered by the Board would allow an aide to work with J.R. on exposure to the community; however, the ALJ found that this further illustrated that "it is evident that the district has taken steps to place J.R. in a more restrictive environment that is nearing the level of restriction that exists in a residential

23

placement." Id. (emphasis added). The ALJ thus found that this factor weighed in favor of residential placement, since the Board's own recommended placement acknowledged that a "regular classroom" is not sufficient for J.R.'s needs.

Turning to the second Oberti factor—consideration of the educational benefits available to J.R. in a regular class—the Court notes that the ALJ found that J.R.'s current day program "is likely similar to that which he would receive if he were in the residential facility at Bancroft," particularly in light of the fact that students in Bancroft's residential program actually attend the class in which J.R. is currently enrolled. Id. at 114. The ALJ found that the IEPs summarized above, see Section I.C supra, do not demonstrate that J.R. has made meaningful progress at Bancroft, but rather support a finding that J.R. is "altogether flat lining." Id. at 115, 117. Based on the assessments of Dr. LeGoff and Dr. Holmes, as well as D.R.'s observations, this Court agrees. Moreover, it is evident from the testimony and IEPs that, as the ALJ found, J.R. has failed to generalize whatever skills he does gain at Bancroft, as he still requires "hand-over-hand assistance" on certain tasks, and has shown no progress at home. Id. at 117. Thus the ALJ found that, "[i]n a residential setting, J.R. will retain all of the benefits of the day program at Bancroft while also receiving the most important benefit of consistency throughout the day." Id. at 118.

The third factor—consideration of possible negative effects of J.R.'s inclusion on other students in the class—does not appear to have weighed considerably in the ALJ's analysis. The ALJ notes that "[n]o testimony was given with regard to this aspect of his placement." Id. at 119. This Court agrees with the ALJ's determination that, because "J.R. would likely be in the same classroom in either his current or a residential placement," "this factor does not weigh in favor of either placement." Id.

The ALJ also considered six more factors, which the District of New Jersey articulated in

D.B. v. Ocean Township Board of Education.  985 F. Supp. 457 (D.N.J. 1997).  In S.C. v.

Deptford Township Board of Education, a case analogous to the matter now before the Court,

wherein the court affirmed an ALJ's decision that residential placement was appropriate for an

autistic child, the district court found that the "D.B. factors" are "relevant in making the

determination of whether to place a handicapped child in a more restrictive environment."  248

F. Supp. 2d 368, 378 (D.N.J. 2003).  The D.B. factors are as follows:

> (1) whether the child experienced emotional conditions that fundamentally interfered with the child's ability to learn in local placement;
>
> (2) whether the child's behavior was so inadequate, or regressing to such a degree, as to constitute a fundamental interference with the child's ability to learn in a local placement;
>
> (3) whether, before the dispute arose, any health or educational professionals working with the child concluded that the child needed residential placement;
>
> (4) whether the child had significant unrealized potential that required residential placement for development;
>
> (5) whether past experience [with placing the child in a more restrictive environment] indicated a need for residential placement; and
>
> (6) whether the demand for residential placement was primarily to address educational needs.

D.B., 985 F. Supp. at 493-97.[6]  The ALJ found that the first D.B. factor was "not specifically

applicable" to J.R.'s case—presumably because no evidence concerning J.R.'s emotional

conditions was presented in this case.  ALJ Op., 120.  Accordingly, this Court finds that the first

D.B. factor does not weigh in favor of residential placement for J.R.

However, the ALJ found that the majority of the remaining factors—particularly the

second factor—weighed in favor of residential placement for J.R.  The ALJ acknowledged the

---

[6] The Third Circuit has not required that the D.B. factors be considered in the analysis of residential placement; however, this Court elects to consider the six additional factors because the ALJ's Opinion elaborates on them, and because they are useful in evaluating J.R.'s placement.

Board's evidence to support its argument that "J.R.'s maladaptive behaviors have decreased

since he entered Bancroft"; however, the ALJ found that T.R. and D.R. had presented evidence

to refute this.  For example, "Ms. Tomaselli testified that . . . . overall [J.R.'s] maladaptive

behaviors decreased since he entered Bancroft," based on a comparison of behavior data from

Bret Harte, and charts from Bancroft.  ALJ Op., 121.  Despite this testimony, the ALJ credited

the testimony of T.R. and D.R.'s expert, Dr. Holmes, who pointed out the lack of commonality

between the data from Bancroft and Bret Harte.  Id.  This Court affords due weight to the ALJ in

crediting this assessment; moreover, having reviewed the reports submitted to the ALJ, this

Court finds that the Dr. Holmes's analysis of the different reports is accurate.  This is particularly

true in light of the fact that, as the ALJ explains, Dr. Holmes had observed J.R. both in school

and at home, and saw not only that J.R. was under constant one-on-one attention, but that J.R.'s

aggressive behaviors were seen even when he received two-on-one attention.  Id.  Furthermore,

the ALJ noted that Ms. Kerth had collected behavior data on J.R. in January and February of

2010, while J.R. was in class at Bancroft, and testified that "J.R. maintained his aggression

through multiple behaviors that affected [his] ability to learn."  Id. at 122.

    In addition to this testimony, the ALJ based his determination that the second D.B. factor

weighed heavily in favor of residential placement on the testimony of D.R. and Ms. Kerth that

"at home, J.R.'s problem behavior interferes with his ability to learn adaptive skills," and that

J.R's aggressive behavior against family members has increased, as has his tendency to

masturbate, which has also had a negative impact on his toileting skills at home.  Id.  This

testimony illustrated that J.R. is not, in fact, generalizing any skills he learns at Bancroft during

the day and requires a minimum of constant one-on-one attention—which, D.R. testified, the

demands of maintaining the rest of her household preclude her from giving.  As a result, J.R.'s

behavior is currently inadequate, and regressing so as to constitute a substantial interference to J.R.'s education.

The third <u>D.B.</u> factor requires determining whether health or educational professionals working with J.R. found, <u>before</u> T.R. and D.R. instituted the instant proceedings, that J.R. needed residential placement.  T.R. and D.R. filed their due process petition on July 15, 2009.  ALJ Op., 2; <u>see also</u> T.R. and D.R. Compl., ¶ 5.  In spring of 2009, before the due process petition was filed and before J.R. began attending Bancroft's day program, Dr. Holmes had already opined that J.R. required residential placement.  ALJ Op., 123.  Dr. LeGoff had also opined on May 29, 2009 that the Board should "consider" residential placement for J.R.  Neither Dr. Holmes nor Dr. LeGoff was working with J.R. at the time that these recommendations were made; however, both had the opportunity to observe and evaluate J.R. before making their determinations.  Thus the ALJ appropriately determined that "this factor does not weigh overwhelmingly in favor" of residential placement, but "application of this factor places more weight in favor of such placement" than on J.R.'s current placement.  <u>Id.</u>

This Court also agrees with the ALJ's conclusion as to the fourth <u>D.B.</u> factor, that the child have "significant unrealized potential" whose development required residential placement. As the ALJ pointed out, "No witnesses have indicated that J.R. will not benefit from residential placement."  <u>Id.</u>  Furthermore, "no one has stated that J.R. does not have the ability to learn if his behaviors are stabilized."  <u>Id.</u> at 124.  In fact, Mr. Moody, Mr. Del Vecchio, Dr. LeGoff, and Dr. Holmes all testified that J.R. is capable of learning.  <u>See, e.g.</u>, Tr., June 14, 2010 Hearing, 127 (wherein Dr. LeGoff testified that J.R.'s moderate mental retardation indicates that he "can have [a] relatively functional li[fe]," if he receives the more intensive level of instruction a residential placement would afford).  Thus this factor weighs in favor of residential placement.

The ALJ found that application of the fifth factor—whether past experience indicated a need for residential placement—"add[ed] no weight" to the arguments for either day or residential placement, because T.R. and D.R. have now sought residential placement because of "behaviors that had not been as problematic in the past as they are now."  ALJ Op., 124-25. Because T.R. and D.R. seek residential placement because of J.R.'s behaviors in his <u>current</u> placement, this Court finds that the ALJ's analysis as to the irrelevance of the fifth <u>D.B.</u> factor is accurate.  J.R.'s prior placements all indicated that J.R. required more restrictive placement in a more structured environment; that experience does not lean in favor of denying the even more restrictive solution of a residential placement, but it does not necessitate residential placement, either (though it demonstrates a trend in the direction of increased restriction).

Finally, the sixth <u>D.B.</u> factor—whether the demand for residential placement was made primarily in response to educational needs—weighs in favor of residential placement as well. The ALJ found that this was especially true as Ms. Tomaselli had testified that "J.R.'s life skills were part of his educational goals."  ALJ Op., 125.  Of course, where "residential placement would be to provide essentially custodial services, . . . or to address parental concerns primarily dealing with behavior or social problems at home or after school, . . . or to relieve parents of the burdens of raising a severely handicapped child," residential placement has been "disallowed" or "discontinued."  <u>D.B.</u>, 985 F. Supp. at 497-98 (D.N.J. 1997).  However, the Third Circuit has affirmed residential placement in circumstances where it is demonstrated that a child will benefit from "a consistent educational program [that is] enforced throughout all of [the child's] waking hours."  <u>M.C. ex rel. J.C. v. Central Regional Sch. Dist.</u>, 81 F.3d 389, 394 (3d Cir. 1996).  This underscores the notion that an "educational program" does not simply include the material taught in lessons at Bancroft (for example, language skills), but that necessary life skills such as

toileting are considered part of J.R.'s "educational needs" as well.  Where the evidence demonstrated that "any attempts to reduce [a mentally retarded child's] severe self-stimulatory behavior or improve his toileting, eating, and communication skills would succeed only in the intense atmosphere of a round-the-clock residential setting," the Third Circuit held that residential placement was appropriate.  Id.  In this case, because these have been identified as education goals for J.R., the sixth factor weighs in favor of residential placement as well.

Accordingly, this Court affirms the ALJ's determination that both the Oberti factors and the D.B. factors weigh in favor of residential placement for J.R., despite the value placed on mainstreaming by the IDEA.  As in the case of S.C. v. Deptford Township Board of Education, here the Court considers the placement of an autistic child who "suffers from severe behavioral problems that negatively impact, and in some instances preclude, his ability to participate in educational activities that are well within his mental and physical capabilities."  248 F. Supp. 2d 368, 378 (D.N.J. 2003).  Like the S.C. Court, this Court agrees with the ALJ that residential placement is necessary for J.R. to receive a free appropriate public education.  As explained above, the Court reaches this determination after having considered the Board's allegations that the ALJ was biased and prejudiced toward T.R. and D.R., and in light of our conclusions (detailed above) as to which of the ALJ's findings are not entitled to the customary deference of the "due weight" standard.

### C. Award of Costs and Attorneys' Fees

Finally, T.R. and D.R. contend that, as the prevailing party in this matter, they are entitled to an award of costs and attorneys' fees.  Although T.R. and D.R. indicate that they seek this award pursuant to 20 U.S.C. § 1415(e)(4), it appears that the applicable provision of the IDEA is 20 U.S.C. § 1415(i)(3)(B)(i)(I), which reads as follows: "In general in any action or proceeding

brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability . . . ."  In this case, T.R. and D.R. have prevailed on their claim that J.R. requires residential placement in order that the IDEA's requirement of FAPE be satisfied, but the ALJ did not grant T.R. and D.R. Compensatory Education payments beginning in the 2007-08 school year.  (The latter finding, the denial of Compensatory Education payments, has not been raised on review to this Court.)  The Third Circuit has explained that "[a] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."  P. N. v. Clementon Bd. of Educ., 442 F.3d 848, 855 (3d Cir. 2006).  According to such a definition, this Court finds that T.R. and D.R. are the prevailing party in this proceeding.  The Board does not appear to dispute that, if this Court affirms the ALJ's decision, T.R. and D.R. are entitled to an award of fees and costs.

The IDEA further explains that "[f]ees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished," and that "[n]o bonus or multiplier may be used in calculating the fees awarded under this subsection."  20 U.S.C. § 1415(i)(3)(C).  In this case, T.R. and D.R. have not indicated the amount of fees they seek.  Accordingly, this Court cannot decide whether the attorneys' fees and costs claimed by T.R. and D.R. are reasonable.

## IV.   CONCLUSION

For the foregoing reasons, T.R. and D.R.'s motion for summary judgment on a stipulated record is **GRANTED**.  T.R. and D.R. are ordered to submit a request for attorneys' fees and costs in a sum certain within **fourteen (14) days** of the entry of the Order in this case, along with

appropriate documentation demonstrating that the amount requested is reasonable.  After receipt of T.R. and D.R.'s request for reasonable fees, the Cherry Hill Township Board of Education will then have **seven (7) days** to oppose the motion.  The motion of the Cherry Hill Township Board of Education for summary judgment is **DENIED**.  An accompanying Order shall issue today.


Dated: 4/17/2012                                   /s/ Robert B. Kugler
                                                           ROBERT B. KUGLER
                                                           United States District Judge